IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland Corporation, | ) ) ) | |
| Plaintiff, | ) | Case No. 03-796-KI |
| vs. | ) ) | OPINION AND ORDER |
| STANLEY CONTRACTING, INC., an Oregon Corporation; JAMES A. STANLEY, an individual, | ) ) ) ) | |
| Defendants. | ) ) | |
| STANLEY CONTRACTING, INC., an Oregon Corporation; JAMES A. STANLEY, an individual, | ) ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| CITY OF CARLTON, an Oregon Municipal Corporation, | ) ) ) | |
| Third-Party Defendant. | ) | |

Joseph A. Yazbeck
Yazbeck, Cloran & Hanson, LLC
1300 S. W. Fifth Avenue, Suite 2750
Portland, Oregon 97201-5609

      Attorneys for Defendant, Third-Party Plaintiffs

Gary A. Rueter
John N. McKeegan
Haugeberg Rueter Gowell Fredricks,
Higgins & McKeeganP.C.
620 NE 5th Street (P.O.Box 480)
McMinnville, Oregon 97128

      Attorneys for Third-Party Defendant, City of Carlton

KING, Judge:

Third-party plaintiff Stanley Contracting, Inc. ("Stanley") contracted with third-party defendant City of Carlton ("Carlton") for construction of improvements to Carlton's water system. When problems arose, Carlton terminated Stanley. Stanley and its principal, Jimmy Stanley, allege claims against Carlton for breach of contract, breach of the implied covenant of good faith, and breach of the warranty of drawings and specifications. Carlton alleged a counterclaim for breach of contract and setoff. Before the court are Third-Party Defendant City of Carlton's Motions for Partial Summary Judgment re Filtronics (#102), re Breach of Contract and Breach of the Covenant of Good Faith (#107), re Individual Claims of Jimmy Stanley (#114), re Wrongful Termination (#118), and re *Eichleay* Damages (#122). For the reasons below, I grant these motions in part.

**FACTS**

I.    <u>The Contract</u>

Carlton put work for the expansion and modification of its water treatment plant out for bid. The Instructions to Bidders, Section 9 states:

> The Contract, if awarded, will be on the basis of material and equipment described in the Drawings or specified in the specification without consideration of possible substitute or "or equal" items. Whenever it is indicated in the Drawings or specified in the Specifications that a substitute or "or equal" item of material or equipment may be furnished or used by Contractor if acceptable to the ENGINEER, application for such acceptance will not be considered by the engineer until after the Effective Date of the Agreement. The procedure for submittal of any such application by Contractor and consideration by the ENGINEER is set forth in Paragraph 6.05 of the General Conditions and may be supplemented in Division 1 – General Requirements.

Peck Supp. Aff. Ex. 1 at 2.

Stanley based its bid on components supplied by Filtronics and listed Filtronics as first tier subcontractor in its bid. The bids were opened on July 6, 2001.

According to Jimmy Stanley, his company never received a complete copy of the written terms and conditions of the Filtronics quote. He learned after bid opening that Filtronics would not sign Stanley's form of subcontract nor provide payment or performance bonds.

On August 10, 2001, Stanley and Carlton entered into a contract for the modification and expansion of Carlton's existing water treatment plant ("Schedule 1") and the construction of a new steel water reservoir ("Schedule 2") (Schedule 1 and Schedule 2 collectively, the "Project"). The only parties to the contract are Carlton as "Owner" and Stanley Contracting Incorporated as "Contractor." The construction documents for the Project were created by the project engineering firm of Tetra Tech/KCM, dated June 2001.

The following parts of the contract are relevant to the claims:

If there is a conflict between contract documents, the document highest in precedence shall control. The precedence shall be:

First: Permits from other agencies as may be required by law.

Second: This Agreement; including subsequent Change Orders to the Agreement.

Third: Technical Specifications, Divisions 1-17

Fourth: Additional Required Terms and Conditions, Standard General Conditions of the Construction Contract and Supplementary Conditions

Fifth: Construction Drawings, Sheets 1-101 inclusive

Sixth: Oregon APWA Standard Drawings

Seventh: Oregon APWA Standard Specifications

Eighth: Reference Specifications

Ninth: Bidder's Proposal

EJCDC Standard Form of Agreement Between Owner and Contractor on the Basis of a

Stipulated Price, Article 9 – Contract Documents, ¶ 9.02 Precedence of Contract Documents,

Peck Aff. Ex. 1 at 7.[1]

A. Whenever an item of material or equipment is specified or described in the Contract Documents by using the name of a proprietary item or the name of a particular Supplier, the specification or description is intended to establish the type, function, appearance, and quality required. Unless the specification or description contains or is followed by words reading that no like, equivalent, or "or-equal" item or no substitution is permitted, other items of material or equipment or material or equipment of other Suppliers may be submitted to ENGINEER for review under the circumstances described below.

---

[1] Because there is no issue on whether a term of the contract was easily visible, I will not duplicate the various types of emphasis in the printed terms.

1. "Or-Equal Items:  If in ENGINEER's sole discretion an item of material or equipment proposed by CONTRACTOR is functionally equal to that named and sufficiently similar so that no change in related Work will be required, it may be considered by ENGINEER as an "or-equal" item, in which case review and approval of the proposed item may, in ENGINEER's sole discretion, be accomplished without compliance with some or all of the requirements for approval of proposed substitute items.  For the purposes of this paragraph 6.05.A.1, a proposed item of material or equipment will be considered functionally equal to an item so named if:

a.  in the exercise of reasonable judgment ENGINEER determines that:  (i) it is at least equal in quality, durability, appearance, strength, and design characteristics; (ii) it will reliably perform at least equally well the function imposed by the design concept of the completed Project as a functioning whole, and;

b.  CONTRACTOR certified that: (i) there is no increase in cost to the OWNER; and (ii) it will conform substantially, even with deviations, to the detailed requirements of the item named in the Contract Documents.

2.  Substitute Items

a.  If in ENGINEER's sole discretion an item of material or equipment proposed by CONTRACTOR does not qualify as an "or-equal" item under paragraph 6.05.A.1, it will be considered a proposed substitute item.

b.  CONTRACTOR shall submit sufficient information as provided below to allow ENGINEER to determine that the item of material or equipment proposed is essentially equivalent to that named and an acceptable substitute therefor.  Requests for review of proposed substitute items of material or equipment will not be accepted by ENGINEER from anyone other than CONTRACTOR.

Standard General Conditions of the Construction Contract, Sec. 6.05, Substitutes and

"Or-Equals", Peck Aff. Ex. 1 at 9-10.

C.  CONTRACTOR shall be fully responsible to OWNER and ENGINEER for all acts and omissions of the Subcontractors, Suppliers, and other individuals or entities performing or furnishing any of the Work just as CONTRACTOR is responsible for CONTRACTOR's own acts and omissions. Nothing in the Contract Documents shall create for the benefit of any such Subcontractor, Supplier, or other individual or entity any contractual relationship between OWNER or ENGINEER and any such Subcontractor, Supplier or other individual or entity, nor shall it create any obligation on the part of OWNER or

ENGINEER to pay or to see to the payment of any moneys due any such Subcontractor, Supplier, or other individual or entity except as may otherwise be required by Laws and Regulations.

      D.  CONTRACTOR shall be solely responsible for scheduling and coordinating the Work of Subcontractors, Suppliers, and other individuals or entities performing or furnishing any of the Work under a direct or indirect contract with CONTRACTOR.

Standard General Conditions of the Construction Contract, Sec. 6.06, Concerning

Subcontractors, Suppliers, and Others, Blumanthal Aff. Ex. A.

      Material and equipment shall be new and of a quality equal to that specified.

Technical Specifications, Division 1, Sec. 01600, Material and Equipment, ¶ 1.03, Peck Aff.

Ex. 1 at 11.

      A.  No substitutions will be allowed unless approved by the Owner prior to bid opening.  Requests for approval must be submitted to the Owner in writing at least ten days prior to bid opening.  Catalog cuts or physical samples must be submitted with request for approval.  Only requests submitted by a distributor firm will be considered.

Technical Specifications, Sec. 8710, Finish Hardware, Products, Manufacturers, ¶ 2.01, Peck

Aff. Ex. 1 at 13.

      The package treatment unit and equipment shall be supplied by one manufacturer.  The package treatment system shall be Filtronics model FHD-13.  The package system shall include two pressure floculator tanks, and two pressure filter vessels controls for the existing and new treatment systems, and ancillary equipment as specified here.

Technical Specifications, Division 11, Sec. 11200, Products, Package Treatment Unit, Water

Treatment Equipment, ¶ 2.01A, Peck Aff. Ex.1 at 15.

      I.  The tube settler shall be Pacific Keystone Key-Pac TT or equal.  If other than the above unit is submitted then the Contractor is responsible for any additional cost required to modify the mechanical, structural, controls or electrical design and construction to accommodate the different geometry of submitted equipment.

Technical Specifications, Division 11, Sec. 11200, Water Treatment Equipment, ¶ 2.17, Stanley

Aff. Ex. 2 at 17.

> 1. Electrical water heater shall be A.O. Smith Energy Saver 50 gallon electric tank type water heater, ASHRAE 90A, glass lined, automatic temperature controls, dual 4,500 watt elements, 240 volt, single-phase, single point electrical connection, steel jacket, glass fiber insulation, 150-psi tank working pressure, magnesium anode protection, ASME rated temperature and pressure relief valve, brass drain valve, 3/4-inch by 18-inch long corrugated copper flexible connectors.

Technical Specifications, Division 13, Plumbing Systems, Sec. 15400, Water Accessories,

Electrical Water Heater, ¶ 2.09, Peck Aff. Ex. 1 at 22.

The contract drawings contain statements such as "SHADED COMPONENTS SHALL

BE PROVIDED BY FILTRONICS, INC." and "ALL CHEMICAL FEED PUMPS SHALL BE

PROVIDED BY FILTRONICS, INC." Stanley Aff. Ex. 1 at 1, 4.

II.    Substitutions

On August 20, 2001, Tetra Tech/KCM received a written request from Stanley to

substitute Pacific Keystone equipment for the specified Filtronics equipment. At some point,

Stanley offered Carlton a $100,000 reduction in contract price if the substitution was allowed.

Peter Blumanthal, Tetra Tech/KCM's project engineer, plotted the equipment sizes to see

if the Pacific Keystone filter vessels would fit into the water treatment plant building footprint.

Blumanthal and Stanley representatives discussed the substitution request at a Project

pre-construction meeting on August 22, 2001. Tetra Tech/KCM got Stanley's permission to

contact Pacific Keystone directly about the substitution proposal. Blumanthal, along with Tetra

Tech/KCM project engineer Gordon Munro and project manager Alan Peck, studied Stanley's

substitution proposal. They formulated ten questions about the technical details of the proposal

and submitted them to three Pacific Keystone representatives on August 29, 2001. Tetra

Tech/KCM received Pacific Keystone's response on September 4, 2001 and discussed it internally in preparation for meeting with Pacific Keystone representatives in person to discuss the proposal in depth.

On September 7, 2001, Blumanthal wrote Stanley about the legal requirements for substituting a first tier subcontractor, namely Filtronics, and told Stanley that for Carlton to consider the offer, Stanley would have to comply with ORS 279.322 regarding the substitution of a nondisclosed first tier subcontractor. Blumanthal also required Stanley to indemnify, defend, and hold harmless Carlton and Tetra Tech/KCM if the substitution was challenged in court and to agree that the liquidated damage provision would apply if the Project was delayed due to legal challenges.

Peck and Blumanthal attended a Carlton City Council Meeting on September 10, 2001, and provided Tetra Tech/KCM's recommendation to reject Stanley's request to substitute Pacific Keystone filtration equipment for Filtronics equipment. Peck states that the primary reason was lack of performance data for the Pacific Keystone equipment sufficient to show that it could successfully filter water with the turbidity conditions of Carlton's water supply. Peck also had cost and operational concerns associated with two treatment processes which operate in dissimilar fashions.

Filtronics insisted on providing the tube settler, which was specified as "Pacific Keystone Key-Pac TT or equal." Although Stanley never made a request to substitute, Carlton allowed the substitution with no formal request or process. The substitution caused changes in the design of all the mechanical yard piping in the area of the tube settler, as well as several other changes. According to Jimmy Stanley, these changes contributed to the delay in the submittal approval

process and delayed the submittals of the other subcontractors whose equipment connected to the Filtronics equipment. Carlton gave Stanley no time extension to account for this issue.

III. Delays

Stanley attributes numerous causes of delay to Filtronics: (1) payment terms; (2) inadequate drawings; (3) problematic deliveries; (4) initial startup; and (5) bankruptcy.

According to Stanley, Filtronics would not agree to Stanley's normal payment terms. Filtronics requested down payments for the components it was to supply. Stanley did not want to pay for the components until it received them. These payment terms were negotiated until Stanley and Filtronics signed a subcontract on October 18, 2001. Jimmy Stanley also states that Filtronics regularly demanded more payment than their progress in fabrication or submittal design entitled them to. Jimmy Stanley believes that the delay caused by Filtronics and Carlton was at least seven months.

Stanley received a complete set of drawings from Filtronics in mid to late November 2001. Carlton's engineers rejected the drawings because they were not in conformance with the contract plans and specifications. Filtronics submitted three more sets of drawings which Carlton rejected. Carlton approved a fifth set of drawings in late March 2002. The delay in the drawings caused Stanley to delay starting the building. According to Daniel Orr, Stanley's Project Manager:

> We did busy work and some important things too while we were waiting for the drawing to get done, but we would have liked to have started the building quite a bit earlier. And required us to piecemeal some of the outside piping we did. Because we didn't know where it was going to come into the building. We ran some of the lines over but couldn't complete them until we knew where the equipment would be located.

Orr Depo. at 110. Stanley rescheduled subcontractors to work around Filtronics' delays. Orr states that due to the lack of approved drawings and timely equipment deliveries, there was a substantial reduction in the amount of work that could be accomplished between January and April of 2002. According to Orr, the work on Schedule 1 was at a virtual standstill, though some of the attendant work could be accomplished.

Filtronics failed to make timely and complete deliveries. This impacted Stanley's efficiency. Filtronics also sent some components cash-on-delivery, which Stanley refused to accept. This caused Filtronics to store the equipment off-site until the two companies reached an agreement. Filtronics refused to provide operation and maintenance manuals for the components it supplied until it was paid in full.

Filtronics refused to participate on the scheduled initial startup date, claiming that it did not receive Stanley's request for it to do so. This caused Stanley to delay the initial startup so it could send a request for Filtronics' participation.

Filtronics filed for bankruptcy on March 27, 2002. Jimmy Stanley directed his company to continue the Project utilizing a reduced work force to conserve costs. He was concerned about whether Filtronics would be able to perform.

Blumanthal examined the daily construction progress reports and partial pay applications submitted by Stanley. Based on this data, Blumanthal states that except for three weeks around the holiday period, Stanley's work force worked on the Project during each work week.

Tetra Tech/KCM wrote Stanley a series of letters with numerous complaints: (1) on January 4, 2002, about the lack of an updated schedule, estimated delays, and lack of critical submittals; (2) on March 12, 2002 about concern that the Project will not be completed on time;

and (3) on June 28, 2002 about payment issues with Filtronics, significant schedule delays, and lack of required permits.

Carlton and Filtronics dealt with each other directly at times. On August 27, 2001, Filtronics wrote Carlton offering reasons why Carlton should not grant Stanley's request to substitute Pacific-Keystone equipment.

On March 12, 2002, Filtronics wrote Tetra Tech/KCM to address several issues and concluded that "[a]ll through the project we have offered the best of our expertise and experience in the best interest of all parties concerned. We want to make this a 'Flag Ship' installation that all can be proud of and provide the City of Carlton with a quality treatment system." Stanley Aff. Ex. 8 at 2.

Carlton also got involved in the payment disputes between Stanley and Filtronics. On November 15, 2001, Stanley wrote Tetra Tech/KCM asking to pass through the Filtronics billings in an effort to get some relief from the Filtronics payment terms which Stanley felt forced to accept because Filtronics was a sole source. On December 10, 2001, Tetra Tech/KCM wrote Carlton to provide additional information on Stanley's request for a 40% advance payment for the Filtronics equipment prior to its fabrication. Tetra Tech/KCM recommended against the advance payment for several reasons including industry practice, no contractual obligation to do so, and possible problems with the funding agency and the surety.

On April 29, 2002, Filtronics wrote Tetra Tech/KCM to propose a joint check arrangement. Filtronics wrote Carlton directly on May 6, 2002 to make the same request for a joint check arrangement. Stanley was not copied on either letter.

On May 14, 2002, an attorney for Carlton, Walter Gowell, wrote Filtronics to explain that pay estimate #5 was disbursed to Stanley on May 9, 2002 and Carlton expected that Stanley

would be paying Filtronics promptly. Gowell asked to be advised within ten days as to whether Filtronics had received payment and resumed its activities on the Project.

Stanley's attorney, Joe Yazbeck, and Filtronics' attorney, Neil Pedersen, exchanged letters between May 23 and June 6, 2002 accusing each other's client of delayed performance. The letters were copied to Gowell. On June 3, 2002, Gowell sent Yazbeck a written summary of Pedersen's proposal which would have restarted the manufacture of the equipment and extended longer credit terms to Stanley. Yazbeck responded to Gowell on June 7, 2002, and asked Gowell to participate in a conference call with Pedersen to "wrap it up." Gowell continued to act as a go-between and sought approval for payment by two-party check.

On June 11, 2002, Gowell told Stanley's attorney that he had just obtained approval from Carlton's City Council to pay Filtronics either directly or through a joint check issued to both Stanley and Filtronics, within 30 days of shipment. The plan was subject to approval by Stanley and Filtronics. On June 12, 2002, Yazbeck agreed with the plan outlined in Gowell's email. Filtronics agreed on June 20, 2002, as long as Carlton obtained Stanley's endorsement of any joint check within the 30 day payment window and prior to sending the check to Filtronics.

Thereafter, Carlton performed its part of the agreement by auditing Stanley's pay requests in keeping with normal payment procedures, fielding inquiries about payments from Filtronics and other subcontractors and suppliers, and processing payment by two-party checks for equipment manufactured by Filtronics and shipped to Stanley. This included: (1) numerous communications between Blumanthal and Filtronics about payments, status of work in progress, and delivery schedules; (2) agreement by Blumanthal for Carlton to "make up the difference in what Stanley was willing to pay Filtronics in the interest of keeping things rolling;" (3) letter from Gowell to Filtronics transmitting payment and reconciling the amount; (4) telephone call

from Pacific Services to Blumanthal concerning the substandard chemical feed panels delivered by Filtronics and Blumanthal's decision to look to Stanley to correct the problem. Stanley Second Supp. Aff. Ex. 29-9. Stanley was not included in the telephone conversations between Blumanthal and Filtronics but Blumanthal did at times relay the information to Stanley later the same day.

Carlton characterizes the communications as its inquiries about invoice payments to Stanley and attempts to be updated on delivery dates. Carlton states that its role was limited to assurances of payment for equipment actually delivered in accordance with the agreement between Stanley and Filtronics.

The City Council also authorized sending the project engineer, Tetra Tech/KCM, to Filtronics to assess the status of the work and to determine an expedited delivery schedule based on Carlton's direct payment of future delivery invoices. On June 21, 2002, Blumanthal reported on his visit to Filtronics to Gowell, which Blumanthal described as tense and representative of the lack of cooperation previously experienced with Filtronics. Blumanthal was unable to obtain any information about recent equipment orders or subcontractors who would be doing the fabrication.

On July 10, 2002, Tetra Tech/KCM wrote Stanley with a list of five serious deficiencies and actions Carlton required of Stanley to come into compliance with the contract before August 16, 2002.

Carlton paid Filtronics directly on October 7, 2002, bringing the payments current on all shipped equipment.

IV.    Contract Termination

On October 14, 2002, Blumanthal notified Stanley by letter that the Project was significantly behind schedule.  He reiterated that time was of the essence.  Carlton never issued a written or oral change order requiring Stanley to suspend work on the Project or to have its employees standby and remain ready to resume work immediately at full speed.

On December 2, 2002, Tetra Tech/KCM sent Stanley a letter discussing the status of numerous change orders.  On December 3, 2002, a startup meeting was held for the Project.  Tetra Tech/KCM took minutes which do not reflect any discussion about the lateness of the Project.

Carlton issued a joint check to Filtronics and Stanley on December 9, 2002.

On December 20, 2002 and again on December 27, 2002, Jimmy Stanley wrote Blumanthal.  He blamed Filtronics for problems and delays on the Project, exacerbated by Carlton's issuance of joint checks, and claimed a loss of $350,000 to $450,000 in damages.  Jimmy Stanley notified Blumanthal that Stanley would no longer accept a joint check as payment for the Project and would not authorize further payments to Filtronics without securing a satisfactory hold harmless agreement from Carlton accepting full financial responsibility for delay damages caused by Filtronics.

On January 3, 2003, Peck wrote Jimmy Stanley to provide written notice of continuing deficiencies in performance of the contract, including the project schedule delays, responsibility for subcontractor problems, including Filtronics, and not continuing to work because Carlton had not agreed to make financial adjustments.  Peck warned that Stanley must come into full compliance or Tetra Tech/KCM would recommend that Carlton terminate the contract.  Peck required Stanley to do three things by January 13, 2002:  (1) submit a revised project schedule

and written plan for project completion; (2) make a good-faith effort to resolve the issues of payment and equipment delivery from Filtronics by signing joint checks or asking Carlton to pay Filtronics directly; and (3) give written confirmation that the company was unconditionally committed to completing the work in a timely fashion, including continuing the work during resolution of claims.

On January 6, 2003, Carlton informed Stanley that if it did not authorize a joint check payment to Filtronics by January 10, 2003, Carlton would terminate the contract with Stanley.

On January 9, 203, Jimmy Stanley wrote Peck to reiterate that he would not agree to authorize another joint check. He believed that the joint check at issue would pay Filtronics 100% for material supplied with no assurances that Filtronics would perform and no assurances that Filtronics had paid all of its suppliers. Jimmy Stanley also asserted that Carlton was in breach of the contract by being delinquent on the progress payments to Stanley. He stated that Stanley would consider the contract terminated without further notice if Carlton did not bring the payments current within seven days.

Stanley never notified Carlton's engineers that Stanley's work on Schedule 1 of the Project was substantially complete or ready for inspection and never asked Carlton's engineers to issue a certificate of substantial completion.

On January 15, 2003, Peck notified Stanley that the City Council passed a motion to terminate the contract. The letter gave Stanley the required seven day written notice of termination for the following reasons: (1) for failure to perform the work and complete the project on the amended schedule; (2) for failure to accept responsibility for and coordinate the performance of subcontractors and suppliers; (3) for failure to pay subcontractors and suppliers in a timely manner; (4) for failure to carry on and continue the work and adhere to the progress

schedule as required by the terms of the contract; and (5) for failure to provide adequate qualified staff on the project site to perform the work in a timely fashion.

On January 21, 2003, Jimmy Stanley wrote Peck with his comments on the situation with Filtronics. He also stated that because the plant was ready and scheduled for start up, he believed that Carlton terminated the contract because he refused to sign a joint check agreement which would have resulted in overpayment to Filtronics of approximately $30,000.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Individual Claims of Jimmy Stanley

Carlton seeks summary judgment dismissing Jimmy Stanley's individual claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of the warranty of drawings and specifications alleged against Carlton. Carlton contends that because Jimmy Stanley is not a party to the contract, he does not have standing to allege these claims.

Jimmy Stanley notes that he personally guaranteed the company's performance and payment bond, resulting in the surety's judgment being against him personally. He contends that the judgment is the result of Carlton's breach of contract by wrongfully terminating Stanley Contracting Inc. Jimmy Stanley thus argues that he has suffered an injury-in-fact personally and has standing to allege the claims.

The issue is not whether Jimmy Stanley has standing. The issue is whether Jimmy Stanley can allege contract claims based on a contract to which he is not a party. He does not contend that he is a third-party beneficiary to the contract and I have not seen any facts to suggest that he is. See Sisters of St. Joseph v. Russell, 318 Or. 370, 867 P.2d 1377 (1994). Jimmy Stanley's individual claims are in the nature of derivative claims, as described in Caplener v. U.S. National Bank, 317 Or. 506, 514-15, 857 P.2d 830 (1993). The individual damages claimed here are derivative of, and not distinct from, a breach of the contract with the corporation. Thus, the individual claims cannot go forward. I grant summary judgment against them.

II.    Breach of Contract – Wrongful Termination and Filtronics

As part of its breach of contract claim, Stanley alleges that Carlton wrongfully terminated the contract with Stanley. Carlton moves for summary judgment against this part of the claim, contending that undisputed facts show that Stanley breached the contract when it failed to comply with the contract deadlines. Carlton argues that by January 2003, after the completion deadline had passed, Stanley had neither made a written request that the Engineer issue a certificate of substantial completion nor made a written request that the Engineer and Owner conduct a final inspection. Carlton also notes that the contract contained a "time-essence" clause, making the failure to comply with deadlines a material breach and justifying termination

of Stanley.  Carlton argues that time extensions were not available under the contract for delays attributable to Filtronics.

Stanley argues that the contract required the use of Filtronics as a sole-source vendor without satisfying the procedures in the Oregon Public Contracting Code, ORS Ch. 279, to allow it to do so under an exemption.  Thus, Stanley contends that because the contract violated ORS 279.017,[2] it is an illegal contract and the term specifying Filtronics is void.

The sole source question is a matter of contract interpretation.  Under Oregon law, the interpretation of a contract is a question of law for the court.  <u>Hoffman Construction Co. v. Fred S. James & Co.</u>, 313 Or. 464, 469, 836 P.2d 703 (1992).

"To interpret a contractual provision, . . . , the court follows three steps.  First, the court examines the text of the disputed provision, in the context of the document as a whole."  <u>Yogman v. Parrott</u>, 325 Or. 358, 361, 937 P.2d 1019 (1997).  "If the provision is clear, the analysis ends."  <u>Id.</u>  "When considering a written contractual provision, the court's first inquiry is what the words of the contract say . . . .  To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question.  The meaning of disputed text in that context is then determined.  In making that determination, the court inquires whether the provision at issue is ambiguous.  Whether terms of a contract are ambiguous is a question of law.  In the absence of an ambiguity, the court construes the words of a contract as a matter of law."  <u>Id.</u>  (quoting <u>Eagle Industries, Inc. v. Thompson</u>, 321 Or. 398, 405, 900 P.2d 475 (1995)).

---

[2] "Specifications for public contracts shall not expressly or implicitly require any product by any brand name or mark, nor the product of any particular manufacturer or seller unless the product is exempt under subsection (2) of this section."  ORS 279.017(1).

A contract or term is unambiguous if it has only one sensible and reasonable interpretation. D&D Co. v. Kaufman, 139 Or. App. 459, 462, 912 P.2d 411 (1996). Neither party here contends that the contract is ambiguous. I agree. Thus, the last two steps of the analysis are not needed.

The contract's Technical Specifications, Division 11, and the contract drawings both contain statements such as the "package treatment system shall be Filtronics model FHD-13"[3] and "SHADED COMPONENTS SHALL BE PROVIDED BY FILTRONICS, INC."

The Standard General Conditions of the Construction Contract explains:

> Whenever an item of material or equipment is specified or described in the Contract Documents by using the name of a proprietary item or the name of a particular Supplier, the specification or description is intended to establish the type, function, appearance, and quality required. Unless the specification or description contains or is followed by words reading that no like, equivalent, or "or-equal" item or no substitution is permitted, other items of material or equipment or material or equipment of other Suppliers may be submitted to ENGINEER for review under the circumstances described below.

Because the precedence clause puts the Technical Specifications above the Standard General Conditions of the Construction Contract,[4] Stanley contends that the "or-equal" and substitution provisions are superceded by the "shall be Filtronics" language in the Technical Specifications. Thus, Stanley argues that the contract specifies a sole source.

The precedence clause is only effective "[i]f there is a conflict between contract documents." I do not see a conflict here. Consequently, the precedence clause is not used to interpret these provisions. The Technical Specifications call out Filtronics but are not followed

---

[3] Citations into the record are given in the Facts section of this opinion.

[4] The precedence of the Construction Drawings is below the Standard General Conditions of the Construction Contract. Thus, the language on the drawings does not support Stanley's argument.

by language "reading that no like, equivalent, or 'or-equal' item or no substitution is permitted." Thus, a request for an "or-equal" or substitute item can be submitted to the Engineer. I find as a matter of law that the contract does not specify Filtronics as a sole source.

Stanley also argues that Filtronics was a disclosed first tier subcontractor so Carlton's requirement to follow the statute's requirement to substitute a nondisclosed first tier subcontractor is without legal support. I decline to address this argument at this time. Whatever statutory requirements existed for a substitution, the contractual requirements also existed and had to be complied with.

Stanley alternatively argues that Carlton was actively managing Filtronics' performance by specifying Filtronics in the contract, by refusing to accept the substitution offered by Stanley, by Carlton's own substitution of Filtronics for the settler tubes, and by active management of Filtronics' performance. Based on this, Stanley contends that Carlton took over responsibility for this part of the contract and Stanley cannot be held in default if Carlton's selected subcontractor caused delays. Thus, Stanley argues that Carlton's decision to terminate Stanley is a breach of the contract.

My review of the cases briefed by the parties makes it clear that construction disputes are highly factually dependent. A few doctrines are also discussed in the cases that have some application here. Ordinarily, a general contractor is responsible for the delays of its subcontractors. Appeals of Stephenson Associates, Inc., Nos. 6573, 6815, 1986 WL 19955, *23 (G.S.B.C.A. May 15, 1986). An exception can arise, however, if the government becomes involved with the subcontractor.

> Even in a situation where the Government has had no post-award involvement
> with a subcontractor it has directed the prime to use, we would have some
> difficulty (as did the Court of Claim in *Penny*) applying a rule that puts the prime

contractor at the mercy of that subcontractor. Certainly we will not extend the rule to any situation in which the Government has had any involvement with the subcontractor of a sort that could possibly have contributed to a delay.

Id. at *24.

Here, Stanley has raised a factual issue that Carlton had an involvement with Filtronics that could have contributed to the delay. In particular, I note the joint check arrangement and the records of telephone calls between Blumanthal and Filtronics which covered details about the delivery schedules. Stanley argues that Carlton's involvement put Filtronics in a stronger position than normally enjoyed by a subcontractor, leaving Stanley with little leverage. Stanley might be able to prove that the involvement was adequate to excuse its delay in finishing construction. See Aurora Aviation v. AAR Western Skyways, 75 Or. App. 598, 707 P.2d 631 (1985) (a party seeking to recover damages for breach of contract must prove either substantial performance or a valid excuse for its own failure to perform). Accordingly, I deny the motion for summary judgment seeking to dismiss the breach of contract – wrongful termination claim.

Based on Stanley's Request for Equitable Adjustment of July 15, 2003, Carlton believes that Stanley thinks Carlton is responsible for Filtronics' failures to perform and should reimburse Stanley for its resulting damages. Carlton seeks summary judgment that it is not liable for breach of contract in this manner, even if it specified Filtronics as a sole source under the contract.[5] Carlton contends that Stanley's remedies for Filtronics' breaches are against Filtronics and not Carlton. Carlton also argues that its interaction with Filtronics came about at the invitation of Stanley's legal counsel when Stanley sought help in obtaining longer credit terms for Stanley's benefit.

---

[5] For purposes of this motion only, Carlton concedes that Filtronics was a sole source.

Stanley argues that when there is active government involvement with a supplier, subcontractor, or a second contractor, the government bears a level of responsibility for the third party's performance.

For the reasons stated in the wrongful termination analysis, I also deny this motion for summary judgment.

III.    Breach of the Covenant of Good Faith and Fair Dealing

Stanley brings a claim for breach of the implied covenant of good faith and fair dealing, based on its allegation that Carlton instructed the Engineer not to consider any substitutes proposed by Stanley.  Arguing that the contract is void, Stanley contends that to allow Carlton to decide in its sole discretion whether to allow replacement of an illegally named vendor eviscerates the public safeguards provided by the Code.  Stanley thus contends that Carlton violated the duty of good faith and fair dealing by frustrating the reasonable objective expectations of the parties, namely that the contract would conform with the Code.  Because of my conclusion that the contract does not name Filtronics as a sole source, I need not address this argument further.

According to Carlton, it rejected the proffered substitute, as it had the right to do in the Engineer's sole discretion, after appropriately studying Stanley's request and concluding that the proposed substitute was not functionally equivalent to the specified equipment.  Thus, Carlton argues that it did not breach the implied covenant of good faith and fair dealing because there is no evidence of bad faith or failure to use honest judgment in exercising its discretion as allowed under the contract.

Every contract contains an implied duty of good faith.  Uptown Heights Associates v. Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639 (1995).  The duty is applied in a manner to

effectuate the objectively reasonable contractual expectations of the parties. The duty of good

faith cannot serve to contradict express contractual terms, even for "an unpleasantly motivated

act that is expressly permitted by contract." Id. (internal quotation omitted).

Oregon courts have upheld a third party's discretionary decision such as this as long as

thee is no fraud, bad faith, or a failure to exercise honest judgment. Valenti v. Hopkins, 324 Or.

324, 333, 926 P.2d 813 (1996) (architectural control committee's approval of house plans). One

indication that an act does not violate the duty of good faith and is within the objectively

reasonable contractual expectations of the parties is that the parties agreed to the conduct at the

time of contracting. See Pacific First Bank v. New Morgan Park Corp., 319 Or. 342, 354, 876

P.2d 761 (1994) (landlord's refusal to consent to transfer of lease when parent corporation

merged into its wholly owned subsidiary).

The contract here provides that after exercising reasonable judgment, the Engineer, Tetra

Tech/KCM, can decide in its sole discretion whether to accept a proposed change of material or

equipment as an "or-equal" or substitute item. The record shows that Tetra Tech/KCM gave

serious consideration to Stanley's requested substitution of Pacific Keystone equipment. Tetra

Tech/KCM formed a team to study the request, sent a list of detailed written questions to Pacific

Keystone, studied the response, and met with Pacific Keystone representatives in person to

discuss the proposal. Tetra Tech/KCM gave two valid reasons for turning down the request. The

only evidence that gives me pause is that Tetra Tech/KCM and Carlton sought indemnification

from Stanley in the event that Filtronics challenged the substitution in court. The contract does

require the contractor to certify that there will be no increase in cost to the owner.

Indemnification could be one component of the certification.

Because Stanley agreed to the substitution procedure in the contract which gave the Engineer such wide discretion, and because there is no evidence of fraud, bad faith, or failure to exercise honest judgment, I conclude that Stanley has failed to raise a factual issue that Carlton, in accepting Tetra Tech/KCM's recommendation, did not act within the objectively reasonable contractual expectations of the parties. I grant summary judgment and dismiss the claim for breach of the covenant of good faith and fair dealing.

IV.     *Eichleay* Damages

As part of its damages, Stanley seeks home office overhead costs, commonly referred to as *Eichleay* damages as defined in Appeal of Eichleay Corp., ASBCA No. 5183, 60-2 BCA ¶ 2688, 1960 WL 538 (July 29, 1960), aff'd on recon., 61-1 BCA ¶ 28494, 1960 WL 684 (Dec. 27, 1960). Carlton seeks partial summary judgment that Stanley cannot recover *Eichleay* damages from Carlton because: (1) Carlton was not the sole cause of Stanley's delays; and (2) Carlton did not require Stanley to remain on standby during the alleged delays. Carlton relies on P.J. Dick, Inc. v. Principi, 324 F.3d 1364 (Fed. Cir. 2003), and Charles G. Williams Construction, Inc. v. White, 326 F.3d 1376 (Fed. Cir. 2003), which both concern construction of federal buildings.

Stanley argues that ORS 279.063, which prohibits contract terms limiting delay damages, makes the question of *Eichleay* damages a jury question. The statute states:

> Any clause in a public contract for a public improvement that purports to waive, release or extinguish the rights of a contractor to damages or an equitable adjustment arising out of unreasonable delay in performing the contract, if the delay is caused by acts or omissions of the public contracting agency or persons acting therefor, is against public policy and is void and unenforceable.

ORS 279.063(1).

Carlton is not contending that any contractual term prevents the award of *Eichleay* damages. Instead, Carlton is arguing that the damages cannot be awarded under the circumstances here. Thus, the statute does not apply.

On the merits, Stanley contends that Carlton is responsible for the delay because of its substantial influence and dealings with Filtronics, essentially taking over administration and control of Filtronics' performance. Stanley contends it was on standby, even though it reduced the number of workers, had workers doing busy work, and had workers performing minor tasks.

I acknowledge that some states have adopted the federal approach to *Eichleay* damages. See Broward County v. Brooks Builders, Inc., 908 So.2d 536 (Fla. App. 2005) (Florida). Other states, however, have not:

> We further note that the *Eichleay* formula has not been adopted by any California decisional authority, and it is questionable whether it should be. Fundamentally, the *Eichleay* formula creates a rate for home office overhead and allocates it to projects in a manner that is *independent of causation.* For example, contractors having a large amount of overhead and few projects will generally post a greater daily rate for home office overhead under the formula than an efficiently run firm with many projects and proportionately lower overhead. As a result, contractors working under the formula could be rewarded for inefficient or extravagant use of home office overhead.

W.B. Construction v. Mountains Community Hospital District, No. SCV61394, 2005 WL 1385571, *8 (Cal. Ct. App. June 13, 2005) (California) (internal citation and quotation omitted). I found no Oregon case addressing the issue. The parties have not adequately briefed whether Oregon courts would apply this doctrine to damages in public construction cases in state court. I am concerned that the federal *Eichleay* case law might be more restrictive than Oregon damages law. Consequently, I deny the motion for summary judgment. The parties may raise the issue again at trial but should be prepared to brief whether the Oregon Supreme Court would adopt the

federal approach. See <u>Ticknor v. Choice Hotels International, Inc.</u>, 265 F.3d 931, 939 (9th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1133 (2002).

## CONCLUSION

Third-Party Defendant City of Carlton's Motions for Partial Summary Judgment re Filtronics (#102), re Wrongful Termination (#118), and re *Eichleay* Damages (#122) are denied. Third-Party Defendant City of Carlton's Motion for Partial Summary Judgment re Individual Claims of Jimmy Stanley (#114) is granted. Third-Party Defendant City of Carlton's Motion for Partial Summary Judgment re Breach of Contract and Breach of the Covenant of Good Faith (#107) is granted in part. I also note that the following claims are unaffected by these motions and are left for trial: Stanley's claim for breach of the warranty of drawings and specifications, Carlton's claim for breach of contract, Carlton's claim for a set off.

IT IS SO ORDERED.

Dated this ___17th_____ day of October, 2005.

       /s/ Garr M. King_____
      Garr M. King
      United States District Judge